UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO OBTAIN LOCATION DATA CONCERNING CELLULAR TELEPHONES ASSIGNED CALL NUMBERS (629) 203-4272, IN THE CUSTODY AND CONTROL OF VERIZON WIRELESS. | ) | No. 4:21-MJ-1003-JMV (UNDER SEAL) |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Josh Moore, a Special Agent with the United States Drug Enforcement Administration, being duly sworn, deposes and states:

## INTRODUCTION

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, currently assigned to the Oxford Resident Office of the DEA. Prior to my assignment at DEA Oxford, I was assigned to the Birmingham DEA District Office between July 2013 and November 2019, and the Huntsville DEA Post of Duty between September 2012 and July 2013. I have been employed with the DEA since March 2012. In that time, I received seventeen weeks of training at the DEA Academy in Quantico, Virginia. This training included in part: identification of various types of controlled substances by sight and odor; the way in which controlled substances are packaged, marketed, and consumed; drug testing; informant handling; evidence handling; search and seizure law; law involving conspiracy; and surveillance and investigative techniques.

Prior to my employment with the DEA, I was a police officer and narcotics investigator for the Tupelo, Mississippi Police Department beginning in 2002.

2. While employed with the Tupelo Police Department, I received training involving a wide range of covert narcotics investigation techniques and undercover operations. Over the course of my career in law enforcement, I have conducted a variety of investigations into violations ranging from simple possession of narcotics to the sale and distribution of various controlled substances. I have conducted hundreds of undercover controlled purchases of controlled substances. I have also participated and led investigations as a case agent involving large scale drug trafficking organizations and complex criminal conspiracies and, among other things, have conducted or participated in surveillances, the execution of search warrants, debriefings of informants, and reviews of taped conversations. I have operated in the role of team leader and case agent for arrests and search warrants, surveillance operations, and Federal Title III investigations on multiple occasions. I have been the affiant on Federal search warrants, Federal Title III intercept warrants, state (Mississippi) search warrants, have testified in local, state, and federal courts, and have presented cases to Federal and state (Mississippi) grand juries for violations of controlled substance laws on many occasions.

3. I have worked in the capacity of a surveillance agent, observing and recording movements of persons involved in the trafficking of illegal narcotics and those suspected of trafficking illegal narcotics. Furthermore, I have conducted hundreds of interviews with individuals charged with narcotics violations and informants and/or witnesses regarding illegal narcotics trafficking. From these interviews, I have obtained an abundance of knowledge regarding narcotics trafficking, distribution, and use. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations use cellular telephones in the course of conducting their drug trafficking activities. Your affiant's investigations and participation in investigations assigned to other law enforcement agents have kept me abreast of methods that are commonly used

by drug traffickers. I know from my training and experience that narcotics traffickers must be able to communicate with their sources of supply as well as with customers and that the typical means of communication employed by narcotics traffickers, when they cannot communicate in face to face meetings, is via telephone facility. Your affiant's experience is that the vast majority of major narcotics traffickers rely extensively on the use of telephone facilities to conduct their drug trafficking transactions, more specifically the placing of orders with their suppliers and the taking of orders from their customers. Your affiant's training and participation in investigations of narcotics trafficking has given me the knowledge to recognize the methods used by narcotics traffickers to conduct their illegal activities, including, but not limited to, (a) common methods of distributing narcotics; (b) the use of telephone communication devices and digital display paging devices; (c) the use of numerical codes and code words to identify themselves, the nature of the communication and the way they conduct their drug related transactions; (d) the common practice of registering and obtaining these communication devices under false names, or names of relatives and/or other parties to avoid detection by law enforcement; and (e) the common practice of obtaining and registering numerous communication devices under one name with false information and providing those communication devices to other members of the organization.

4. I am personally involved in the investigation of the offenses referred to herein, and I have participated in the normal methods of investigation, including, but not limited to, visual surveillance, undercover meetings, the general questioning of witnesses, the use of informants, telephone toll record analysis, covert video camera surveillance, the review of records and reports related to the investigation by state law enforcement agencies, and the review of DEA reports related to the investigation.

5. I submit this affidavit in support of an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), authorizing agents to ascertain the physical

location of the cellular telephones assigned call number 629-203-4272 used by target Fred RANDLE, hereinafter referred to as "TARGET CELLPHONE 1", including, but not limited to E-911 Phase II data (or other precise location information, including NELOS data) concerning TARGET CELLPHONE 1 (the "Requested Information"), for a period of forty-five (45) days.

6. The Requested Information includes all information about the location of TARGET CELLPHONE 1 for a period of forty-five (45) days, during all times of day and night. The Requested Information includes all available E-911 Phase II data, GPS data, NELOS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from TARGET CELLPHONE 1.

7. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the Drug Enforcement Administration and other law enforcement; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another agent, law enforcement officer or witness who may have had knowledge of that statement and to whom I, or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part, unless otherwise indicated. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of the Requested Information, I have not included details of every aspect of the investigation. Facts not set forth herein, or in the attached exhibits, are not being relied on in reaching my conclusion that the requested warrant should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

8. Probable cause exists to believe that the Requested Information will constitute or lead to evidence of offenses involving conspiring to commit drug trafficking crimes – including but not limited to possession of controlled substance with intent to distribute, in violation of Title 21, U.S.C. 841 and 846 (the "TARGET OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses.

9. For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by Fred RANDLE and others unknown. Further, there is probable cause to believe that Fred RANDLE is using TARGET CELLPHONE 1 to commit the TARGET OFFENSES.

**BACKGROUND OF THE INVESTIGATION**

10. DEA Oxford agents are currently investigating a Drug Trafficking Organization (DTO) comprised of multiple members in Northeast Mississippi including Fred RANDLE, Dontrell RANDLE, Yancy RANDLE, and Dewayne ROBINSON. Agents have received information from multiple confidential sources and cooperating defendants who identified Dontrell RANDLE as Fred RANDLE'S brother and a mid-level distributor of ounce to pound quantities of methamphetamine. Fred RANDLE has been identified as the source of supply for Dontrell RANDLE and multiple ounce quantity distributors in the North Mississippi area. Since 2017, confidential source 1 (CS1) has provided information to DEA regarding Fred and Dontrell RANDLE and other methamphetamine distributors in the North Mississippi area. The information obtained from CS1 has been corroborated through telephone toll record analysis of TARGET CELLPHONE 1, surveillance, and debriefing of other confidential sources in the past. CS1 has provided information to DEA agents on multiple occasions since before 2017 that has proven true and reliable and beginning recently, has been corroborated by your affiant. In January, 2020, your affiant spoke with CS1 obtaining historical information about the RANDLE DTO when CS1 told your affiant that he/she was present Dewayne

ROBINSON'S residence on Chapel Grove Road in Monroe County, MS when he received a shipment of thirty five kilograms of methamphetamine from a Hispanic male who claimed to be from Memphis, TN. Later, CS1 knew that ROBINSON sent Fred RANDLE to Memphis to receive a shipment of methamphetamine and transport it back to North Mississippi (MS). However, due to CS1 being arrested in 2018, ROBINSON severed ties with CS1, telling him/her to call Fred RANDLE to receive his/her drugs and CS1 is not in a position to continue supplying information about ROBINSON. CS1 also told your affiant that the community where ROBINSON and the RANDLE'S live is extremely close knit, mostly family, and neighbors routinely watch vehicles that travel on the road and report this to ROBINSON or the RANDLE'S, acting as "lookouts" for the DTO. I know, from my training and experience conducting drug investigations since 2004, that the area where ROBINSON and the RANDLES live is a classic example of a rural environment which allows an organization to become familiar with persons in the area and limit the use of law enforcement informant's and surveillance of the DTO. I also know that compartmentalization, such as when ROBINSON directs CS1 to contact Fred RANDLE for drugs, is another characteristic utilized by seasoned DTO members who want to limit their interaction with other members of the DTO. During calendar year 2020, DEA Oxford Agents, investigating a different DTO, captured evidence that indicated CS1 had conducted drug transactions with sources that was not at the direction of controlling investigators. After discussions with prosecuting officials at the United States Attorney's Office, it was decided that agents would limit the use of CS1 to information gathering only, and no controlled purchases. Therefore, for several months in late 2020 and early 2021, DEA agents did not meet with in person, or utilize CS1 to conducted controlled purchases from Fred RANDLE. On February 11, 2021, your affiant met with CS1 in Tupelo, MS and discussed with him/her about the case referred to herein. CS1 was truthful and forthcoming, admitting to continuing to conduct un-sanctioned drug transactions. CS1 agreed to continue to provide information to DEA regarding the ROBINSON DTO on the limited basis that

agents requested. Your affiant also explained to CS1 that he/she will remain a defendant in the investigation and will be prosecuted in the future. CS1 stated he/she understood and agreed to continue to provide information as a cooperating defendant.

**PROBABLE CAUSE FOR TARGET CELLPHONE 1**

11. Since January, 2019, Oxford DEA agents have utilized multiple confidential sources, including CS1, to conduct multiple controlled purchases of methamphetamine and heroin from Fred RANDLE, Dontrell RANDLE, and Yancy RANDLE. These controlled purchases were conducted at the direction and in the presence of Oxford DEA Agents. Your affiant has analyzed toll records for multiple telephones used by each DTO member. The analysis confirms that Fred RANDLE speaks to Dontrell RANDLE and Dewayne ROBINSON on a regular basis. During calender year 2020, CS1 told your affiant that he/she spoke to Fred RANDLE occasionally and sporadic. CS1 did not have the current telephone number Fred RANDLE was using. Therefore, On February 11, 2021, your affiant instructed CS1 to travel to Fred RANDLE'S residence and attempt to obtain the new telephone number. This meeting was not surveilled by DEA agents. Later on February 11, 2021, CS1 contacted TFO Jason Henson and told him that CS1 traveled to Fred RANDLE'S residence, spoke with Fred and obtained his new number, TARGET CELLPHONE 1, and also saw approximately four pounds of suspected methamphetamine in Fred's residence.

12. On February 23, 2021, your affiant, TFO Henson, and SA Devin Gillespie met with CS1 in Shannon, MS. Agents rode with CS1 as he/she point out the residence where Fred RANDLE is now living. Your affiant also instructed CS1 to call Fred RANDLE on TARGET CELLPHONE 1 and discuss prices for various drugs that he/she knows Fred RANDLE distributes. At approximately 12:30 p.m., CS1 called TARGET CELLPHONE 1. Fred RANDLE did not answer. Your affiant verified the number from the call log on CS1's cellphone and listened while CS1 placed the call on speaker volume. At approximately 12:53 p.m., Fred RANDLE, using TARGET CELLPHONE 1,

called CS1. Your affiant was able to record this phone call as I listened to CS1 and Fred RANDLE discuss prices for methamphetamine, heroin, and cocaine. During a part of the conversation, the parties stated:

CS1: my cousin called me last night, they want to know how much you'll let them get a whole pound of that ice for.

Fred: a whole, one?

CS1: yeah.

Fred: probably about five dollar.

CS1: five dollar?

Fred: yeah.

CS1: so you saying it'll be ten if we get two of them?

Fred: yeah.

CS1: ok.

After the call concluded, CS1 told your affiant that in this part of the conversation, CS1 referred to methamphetamine as "ice". When Fred RANDLE said a whole one would be "five" dollar, CS1 stated he meant that a pound of methamphetamine would cost $5,000.00. I know that this price for a pound of methamphetamine is consistent with prices DEA is seeing in other states at the present time. The conversation continued:

CS1: how much that dog is?

Fred: aw man, the dog gone now, I sold the whole thing for seventy dollar man.

CS1: the whole thing for seventy thousand?

Fred: Yeah.

CS1: when you gonna get some more?

Fred: soon as this boy brings me this money, he down there in Louisiana. He brings that money I'm gonna goddamn retop then.

In this part of the conversation, CS1 referred to heroin as "dog". CS1 stated that Fred RANDLE meant he sold a whole kilogram of heroin for $70,000.00 when he said he "sold the whole thing for seventy dollar." I know that the price of a kilogram of heroin is between $65,000 and $70,000. The conversation continued as Fred RANDLE discussed traveling to Atlanta to purchase cocaine:

CS1: what did they want for the whole brick?

Fred: shit I was getting the mother fucker my self for 41 42.

CS1: they got some good tickets.

Fred: yeah, they legit man.

In this part of the conversation, CS1 referred to a kilogram of cocaine as a whole brick. CS1 stated Fred RANDLE meant he went to purchase a whole kilogram of cocaine for $41,000 or $42,000. When saying "41 42". The prices are consistent with a kilogram of cocaine here and in other states.

13. I know, from my training and experiences, that drug traffickers often uses coded language and numbers when speaking over the telephone in an effort to frustrate law enforcement efforts. I believed that during this phone call, Fred RANDLE attempted to discuss prices of drugs with CS1 using code words like "whole one, 5 dollar, seventy dollar, and 41 42" as discussed herein. The coded language is consistent with words I've heard during other investigations when drug dealers speak over the telephone, and corroborates what CS1 has told your affiant about the phone call.

## AUTHORIZATION REQUEST

14. Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the activities described above. The Requested Information is necessary to determine the location of Fred RANDLE so that law enforcement agents can conduct surveillance

and observe Fred RANDLE meeting with other DTO members like Dontrell Randle and Yancy RANDLE or Dewayne ROBINSON. Surveillance agents can then intercept FRED RANDLE while he is in the act of transporting narcotics to these customers. Furthermore, such information includes leads relating to: (1) the names and identities of suspected suppliers, customers and other individuals who assist in the distribution of narcotics; (2) the location of "stash" houses where narcotics are stored; (3) the identity of transportation sources used by the drug traffickers; (4) the locations of money transfer businesses used by members of the operation to launder proceeds of drug trafficking activities or through which money is exchanged with co-conspirators; (5) the geographic breadth of the suspected drug trafficking cell; and (6) the identity of potential organizers, leaders, managers, or supervisors of the suspected trafficking cell by examining the calling patterns revealed by the toll data.

15. For example, geolocation data could reveal meeting places between Fred RANDLE, Dontrell RANDLE, and Dewayne ROBINSON. This data coupled with phone analysis and agent surveillance can reveal identities of other customers and co-conspirators assisting the RANDLES, including Dewayne ROBINSON, the supplier of methamphetamine.

16. Additionally, the investigation would aid in identifying which residences are used for drug trafficking, identifying other couriers and other co-conspirators of Fred and Dontrell RANDLE and suppliers, and also aid in identifying what, if any, services and financial institutions are being used to house, transfer and launder drug trafficking funds of Fred and Dontrell RANDLE. Finally, geolocation data in this instance would reveal the geographical range with regard to out-of-state drug trafficking activities of Fred RANDLE, Dontrell RANDLE, and others.

17. Wherefore, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents to obtain the Requested Information for a period of forty-five (45) days.

18. It is further requested that the Court direct Verizon to assist agents by providing all information, facilities and technical assistance needed to ascertain the Requested Information, and further direct Verizon, the service provider for TARGET CELLPHONE 1, to initiate a signal to determine the location of TARGET CELLPHONE 1 on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed warrant, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of TARGET CELLPHONE 1, for a period of forty-five (45) days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the Drug Enforcement Administration.

19. It is further requested that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate TARGET CELLPHONE 1 outside of daytime hours.

20. It is further requested that the warrant and this affidavit, as it reveals an ongoing investigation, be ***sealed*** until further Order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on Special Agents and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, Verizon WIRELESS as necessary to effectuate the Court's Order.

21. It is further requested that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of one-hundred twenty (120) days after the termination of the monitoring period authorized by the warrant or any extensions thereof, because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation.

Special Agent
Drug Enforcement Administration

Sworn to before me this 3 day of March, 2021.

@ 9:45 am

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the CELLCO (d/b/a Verizon Wireless) cellular device assigned call number 629-203-4272, International Mobile Subscriber Identity Number (IMSI): 311480620879865, used by target Fred RANDLE, hereinafter referred to as "TARGET CELLPHONE 1".

Records and information associated with TARGET CELLPHONE 1 that is within the possession, custody, or control of Verizon, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

# ATTACHMENT B

**Particular Things to be Seized**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A including "Information about the location of **Target Cellphone 1**" includes all available E-911 Phase II data, GPS data, NELOS, RTT, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A:

a. The following information about the customers or subscribers associated with **Target Cellphone 1** for the time period of February 24, 2021 to present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. **<u>Prospecitve Cell-Site Location Information</u>**: In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of Target Cellphone 1 on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

i. Information associated with each communication to and from Target Cellphone 1 for a period of 45 days from the date of this warrant, including:

1. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;
2. Source and destination telephone numbers;
3. Date, time, and duration of communication; and
4. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Cellphone 1 will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").
5. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. § 841 and 846 (drug trafficking and conspiracy to commit drug trafficking) involving Fred RANDLE and others during the period February 24, 2021 to 45 days after the warrant is signed.